# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

| | |
|---|---|
| **RANDALL A. TERRY,**<br>　　　　**Appellant,**<br><br>**v.**<br><br>**TROY NEWMAN,**<br>　　　　**Appellee.**<br><br>**Cancellation No. 92047809** | )<br>)<br>)<br>)<br>)　　**Appeal No. 2014-____**<br>)<br>)<br>)<br>) |

## NOTICE FORWARDING CERTIFIED LIST

A notice of appeal to the United States Court of Appeals for the Federal Circuit was timely filed on September 9, 2013, in the United States Patent and Trademark Office (USPTO) in connection with the above-identified cancellation proceeding.  Pursuant to 15 U.S.C. § 1071(a)(3) and Federal Circuit Rule 17(b)(1), the USPTO is today forwarding, to counsel for Appellant and Appellee, a certified list of documents comprising the record in the USPTO.

Counsel for Appellant may contact counsel for the Appellee to arrange for designating the appendix.

If a copy of the notice of appeal and the docketing fee of $450.00 have not been filed with the Federal Circuit, counsel is reminded that a copy

of the notice and the docketing fee should be promptly filed with the Federal

Circuit.

The mailing address of the Federal Circuit is:

U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439


Respectfully submitted,


**Teresa Stanek Rea**
Deputy Under Secretary of Commerce for
Intellectual Property and Deputy Director of
the United States Patent and Trademark
Office


Date: October 18, 2013        By: _Susannah Kolstad_
                              **Susannah C. Kolstad**
                              Paralegal Specialist
                              Office of the Solicitor – USPTO
                              Mail Stop 8, P.O. Box 1450
                              Alexandria, Virginia 22313-1450
                              571-272-9035

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing NOTICE FORWARDING CERTIFIED LIST has been served on counsel for Appellant this 18th day of October, 2013, as follows:

Michael S. Culver
MILLEN WHITE ZELANO & BRANIGAN PC
220 Clarendon Blvd., Suite 1400
Arlington, VA 22201

Brian R. Gibbons
BRIAN R. GIBBONS PA
3936 South Semoran Blvd., Suite 330
Orlando, FL 32822-4015

By: *Susannah Kolstad*
**Susannah C. Kolstad**
Paralegal Specialist

THIS OPINION IS NOT A
PRECEDENT OF THE TTAB

Hearing:
February 12, 2013

Mailed:
April 22, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

Trademark Trial and Appeal Board

*Randall A. Terry*
*v.*
*Troy Newman*

Cancellation No. 92047809

Michael S. Culver of Millen, White, Zelano & Branigan, P.C. for Randall A. Terry.

Brian R. Gibbons, Esq. for Troy Newman.

Before Mermelstein, Kuczma and Masiello, Administrative Trademark Judges.

Opinion by Masiello, Administrative Trademark Judge:

Randall A. Terry ("Petitioner"), an individual, has filed a petition for the cancellation of U.S. Registration No. 3179591, owned by Troy Newman ("Registrant"), also an individual. The registration at issue relates to the service mark OPERATION RESCUE as used in connection with "Educational services, namely, providing classes, workshops, seminars and personal instruction in the

Cancellation No. 92047809

field of pro-life issues and social activism."[1]    Petitioner's stated ground for cancellation is that the registered mark "falsely suggests a connection with Petitioner" within the meaning of Trademark Act § 2(a), 15 U.S.C. § 1052(a).[2]  All previously alleged grounds for cancellation relating to Petitioner's ownership of trademark rights were dismissed with prejudice pursuant to the Board's order of November 14, 2008.

Petitioner alleged that he began using the words OPERATION RESCUE in 1987 to identify his activities in the field of pro-life issues; that his fame or reputation was established in the late 1980s and early 1990s; that the words OPERATION RESCUE point uniquely and unmistakably to him; that he is not connected in any way with Registrant's services; and that members of the public have falsely assumed a connection between him and Registrant.

Registrant denied the salient allegations of the petition for cancellation, but admitted that there is no connection between Petitioner and Registrant's services. The case has been fully briefed.

I.    The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122, 37 C.F.R. § 2.122, the registration history of the registration at issue.  The record also includes the following testimony and evidence:

---

[1] Registration No. 3179591 issued on December 5, 2006, with a claim of first use as of July, 1991 and first use in regulable commerce as of July 13, 1991.

[2] Petitioner's Third Amended Petition to Cancel, ¶ 7.

2

Cancellation No. 92047809

A.    Petitioner's Evidence.

    1.    Testimony deposition of Petitioner dated September 30, 2010, with attached exhibits ("Terry I").

    2.    Rebuttal testimony deposition of Petitioner dated April 7, 2011, with attached exhibits ("Terry II").

    3.    Testimony deposition of Philip L. Benham, Director, Operation Save America, with attached exhibits ("Benham").

    4.    Testimony deposition of Joseph Costello, merchant, with attached exhibits ("Costello").

    5.    Testimony deposition of Michael Hirsh, attorney ("Hirsh").

    6.    Testimony deposition of Bruce Moore, minister of Clearcreek Christian Assembly, Springboro, Ohio ("Moore").

    7.    Testimony deposition of Mark Allan Steiner, Assistant Professor, Department of Communications Studies, Christopher Newport University, with attached exhibits ("Steiner").

    8.    Testimony deposition dated September 28, 2010 of Rosemarie Szostak, research analyst at Nerac, of Tolland, Connecticut, with attached exhibits ("Szostak I").

    9.    Rebuttal testimony deposition dated March 16, 2011 of Rosemarie Szostak, research analyst at Nerac, of Tolland, Connecticut, with attached exhibits ("Szostak II").

    10.    Testimony deposition of Rusty Lee Thomas, Assistant Director, Operation Rescue/Operation Save America ("Thomas").

    11.    Petitioner's notice of reliance dated September 30, 2010, containing certain responses of Registrant to interrogatories propounded by Petitioner (P-NOR 1).

    12.    Petitioner's notice of reliance dated September 30, 2010, containing news articles, internet web pages, and excerpts from books (P-NOR 2).

    13.    Petitioner's notice of reliance dated April 18, 2011, containing news articles and internet web pages (P-NOR 3).

Cancellation No. 92047809

B.    Registrant's Evidence.

     1.    Testimony deposition of Thomas Brejcha, President and Chief Counsel of Thomas More Society, Chicago, Illinois, with attached exhibits ("Brejcha").

     2.    Testimony deposition of Philip Faustin, Executive Director, Operation Rescue Colorado ("Faustin").

     3.    Testimony deposition of Patrick Mahoney, Director, Christian Defense Coalition, Washington, DC ("Mahoney").

     4.    Testimony deposition of Jeffrey White, Youth Pastor, Lake Gregory Community Church, Twin Peaks, California, with attached exhibits ("White").

     5.    Registrant's notice of reliance dated January 31, 2011, containing excerpts of printed publications (R-NOR 1).

     6.    Registrant's notice of reliance dated January 31, 2011, containing certain responses of Petitioner to interrogatories and requests for admission propounded by Registrant (R-NOR 2).

II.    Evidentiary Objections

A.    Petitioner's Objections.

1.    Petitioner objects to the relevance of Petitioner's admissions contained in R-NOR 2 on the ground that the requests for admission referred to OPERATION RESCUE as a "mark," and all claims relating to trademark rights have been dismissed. The objection is overruled. The absence of issues relating to ownership of trademark rights does not render Petitioner's responses entirely irrelevant.

2.    Petitioner warns that the publications contained in R-NOR 1 must not be considered for the truth of the matter asserted in them. We heed the warning, but otherwise overrule the objection to R-NOR 1, as the materials contained therein are relevant to demonstrate public perceptions, which are central to this case.

Cancellation No. 92047809

3.      The objection to Wikipedia evidence is overruled.  It is admissible at least to the same extent as other internet evidence for what it shows on its face.  The availability of testimony from persons having first-hand knowledge does not, in this case, invalidate the relevance of other persons' perceptions.  In this case, we have not relied upon the Wikipedia evidence for the truth of the matter asserted therein; however, we note than under appropriate circumstances the Board has found such evidence admissible for that purpose.  *See In re IP Carrier Consulting Group*, 84 USPQ2d 1028, 1032-33 (TTAB 2007).

4.      The objection to articles about prominent business leaders, R-NOR Exhibit F, is overruled.  The articles illustrate how some leaders of organizations are perceived in the context of their organizations, although we have found this evidence to be of very low probative value.

5.      The objection to R-NOR Exhibit G is overruled, as the evidence is relevant to establish varying perceptions of the meaning of the word OPERATION; although we have not found it necessary to refer to this evidence.

6.      The objection to articles showing use of OPERATION RESCUE by third parties is sustained only to the extent that such articles relate to use of the term outside the United States.

B.      Registrant's Objections.

1.      Registrant has moved to strike the entire first testimonial deposition of Petitioner (Terry I) because Petitioner requested that Patrick Mahoney, who was present to observe the deposition on behalf of Registrant, leave the room before

Cancellation No. 92047809

testimony would continue. There is disagreement over whether Petitioner insisted that Mr. Mahoney depart as a condition to continuing to testify. After the completion of Petitioner's testimony period, Mr. Mahoney appeared for a testimonial deposition as Registrant's witness, during which deposition Registrant could have fully reviewed Petitioner's earlier testimony with Mr. Mahoney, if that was desired.

While we do not endorse Petitioner's conduct at his deposition, we find that to strike the entire deposition would entail prejudice to Petitioner outweighing any prejudice suffered by Registrant; and Registrant has not indicated with any particularity which portions of Petitioner's testimony are rendered less reliable for not having been audited in person by Mr. Mahoney. Accordingly, the motion to strike is denied.

2.    Registrant's objection to Petitioner's second testimonial deposition (Terry II) is overruled. Inasmuch as personal interactions between Petitioner and Registrant were raised in testimony offered by both parties, we do not find the additional matters raised during Terry II to be clearly improper as rebuttal testimony.

3.    Registrant's objections to the first and second testimonial depositions of Rosemarie Szostak (Szostak I and II) are overruled. While we agree with Registrant that information and exhibits that are primarily in numerical form (in particular Exhibits 3, 4, 5 and 6) are of very low probative value, inasmuch as information to determine what the enumerated news articles said or meant is almost entirely lacking, they may indicate something about the statistical and

6

Cancellation No. 92047809

geographic distribution of press notices. Similarly, the very large number of very brief excerpts from news items is generally of very low probative value, as one cannot glean with certainty what the news articles actually said or meant. Nonetheless, we admit the depositions and exhibits for what they show on their face.

4.    Regarding the testimonial depositions of Benham, Steiner, Hirsh, Thomas, Costello, and Moore, we have given due regard to the objections raised by Registrant's counsel during the depositions, as well as to what the testimony reveals regarding personal friendships between Petitioner and some of the witnesses.

5.    Finally, we overrule Registrant's objection to Petitioner's third notice of reliance (P-NOR 3) as improper rebuttal.    In view of the large amount of information relating to third-party perceptions that was made of record during the parties' respective testimony periods, it was not clearly improper to submit the contents of P-NOR 3 in rebuttal of the same.

III.    <u>Standing</u>

Petitioner has demonstrated his involvement in the establishment and development, under the name OPERATION RESCUE, of a movement of activists opposed to the practice of abortion; and that he has promoted himself and been referred to in the press as the founder of such movement.    Petitioner has thus shown that he is not a mere intermeddler and has established his standing to seek cancellation of the registration at issue in this proceeding.    *See Cunningham v.*

Cancellation No. 92047809

*Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); and *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

IV.    Standard for Cancellation.

Section 2(a) of the Trademark Act authorizes the Patent and Trademark Office to deny registration to a trademark or service mark that "Consists of or comprises ... matter which may ... falsely suggest a connection with persons, living or dead...." 15 U.S.C. § 1052(a). Following the guidance set forth in *University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., Inc.*, 703 F.2d 1372, 217 USPQ 505, 508 (Fed. Cir. 1983), the Board requires that a plaintiff asserting a claim of a false suggestion of a connection demonstrate:

> (1) that the defendant's mark is the same as or a close approximation of plaintiff's previously used name or identity;
>
> (2) that the mark would be recognized as such, in that it points uniquely and unmistakably to the plaintiff;
>
> (3) that the plaintiff is not connected with the activities performed by the defendant under the mark; and
>
> (4) that the plaintiff's name or identity is of sufficient fame or reputation that when the defendant's mark is used on its goods or services, a connection with the plaintiff would be presumed.

*In re Jackson International Trading Co.*, 103 USPQ2d 1417, 1419 (TTAB 2012); *Hornby v. TJX Companies Inc.*, 87 USPQ2d 1411, 1424 (TTAB 2008); *Buffett v. Chi-Chi's, Inc.*, 226 USPQ 428, 429 (TTAB 1985).

Cancellation No. 92047809

Petitioner argues at length that the final phrase of the Board's test, *i.e.*, the words "a connection with the plaintiff *would* be presumed," is contrary to the language of Section 2(a), which refers to "matter which *may*... falsely suggest a connection." Petitioner argues that the fourth element of the test should properly be that "'a connection with the person... may be presumed' with 'may' interpreted as a reasonable possibility."[3]

We decline to adopt the standard proposed by Petitioner. The Board's four-part test is primarily designed to reflect the nature of the "connection" referred to in the statute, as interpreted by the Federal Circuit in *Notre Dame*. In this regard, the court adopted a very high standard:

> Under concepts of the protection of one's "identity," in any of the forms which have so far been recognized, *the initial and critical requirement* is that the name (or an equivalent thereof) claimed to be appropriated by another must be *unmistakably associated* with the particular personality or "persona."
>
> ...
>
> The mark..., as used by [defendant], *must point uniquely* to the [plaintiff].

*Notre Dame*, 217 USPQ at 509 (emphasis supplied).

Items (1), (2) and (4) of the Board's standard restate the Federal Circuit's express requirements: (a) there must be a "name"; (b) the name must point somewhere in order to constitute a "connection" under the statute (something that it could not do without some "sufficient fame or reputation"); (c) the name must point unmistakably and uniquely to the plaintiff, leading to a perceived or "presumed"

---

[3] Petitioner's brief at 34; *see also* discussion at pp. 30-34.

Cancellation No. 92047809

connection; and (d) the impact of the name must be measured in the context of the defendant's use in connection with the defendant's goods and services.   Item (3) of the Board's test merely gives effect to the statutory word "falsely."   All of the Board's factors (including the questioned word "would") relate directly to the *Notre Dame* court's concept of the statutorily required "connection."

The *Notre Dame* court perceived the policy underlying Section 2(a) to be a recognition of "the right to privacy, an area of law then in an embryonic state." *Notre Dame,* 217 USPQ at 509.   Considering the halting, cautious and inconsistent way in which the right to privacy developed under the common and statutory laws of the different states, as indicated in the authorities cited by the *Notre Dame* court,[4] we cannot read *Notre Dame* as endorsing the idea that the mere possibility of a perceived connection would give rise to a cause of action.   Moreover, *Notre Dame* firmly rejected the suggestion that "the proof with respect to a false suggestion or [*sic*] connection should be less stringent than required under § 2(d)." *Notre Dame,* 217 USPQ at 508 ("We cannot accept appellant's premise.") Petitioner's proposed standard of "a reasonable possibility" of a perceived connection falls far short of the standard applicable to analysis of a likelihood of confusion under Section 2(d).   *Bongrain International (American) Corporation v. Delice de France Inc.,* 1 USPQ2d 1775, 1779 (Fed. Cir. 1987); *Electronic Design & Sales Inc. v. Electronic Data Systems Corp.,* 954 F.2d 713, 21 USPQ2d 1388 (Fed. Cir. 1992);

---

[4] The Court referred to the RESTATEMENT (SECOND) OF TORTS § 652A (1976); 1 R. Callmann, *The Law of Unfair Competition Trademarks and Monopolies* § 1.23 (4th ed. 1981); and W. Prosser, *Handbook of the Law of Torts* 802-18 (4th ed. 1981).

Cancellation No. 92047809

*Morgan Creek Productions Inc. v. Foria International Inc.*, 91 USPQ2d 1134, 1143 (TTAB 2009).

Petitioner argues that the Board's standard is invalid because "The word 'would' is the past tense of 'will' which, by any standard definition, means a certainty, or a requirement or command," such that the phrase "would be presumed" should be taken to mean "shall or must be presumed"[5] This contention does not reflect the reality of Board practice, where the usual standard of proof (and the standard applicable to this case) is "a preponderance of the evidence." *Pro-Football Inc. v. Harjo*, 284 F. Supp. 2d 96, 68 USPQ2d 1225, 1245-1246 (D.D.C. 2003). The Board's standard does not require Petitioner to demonstrate with "certainty" that a false connection with Petitioner actually is perceived. Petitioner's discussion of the meanings of "would" and "will" is overly simplistic and fails to appreciate that the most common words of our language are often the subtlest and most complex in meaning. The definition of "would" in WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993), pp. 2637-2638, contains 18 different definitions of the word, most of them inconsistent with Petitioner's definition, including:

> 6 - b(1) used in auxiliary functions to express probability or presumption in past or present time
> ...
> 7. COULD
> ...
> 10 – used in auxiliary function to express doubt or uncertainty.

---

[5] *Id.* at 31. Petitioner relies upon AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1969) and BLACK'S LAW DICTIONARY (5th ed.).

Cancellation No. 92047809

*Id.* The definition of "will," as a verb, is even more complex and fills nearly two full columns of text. *Id.* at 2616-2617.[6] In sum, the Board is not persuaded that the Federal Circuit's standard, as followed by the Board, is inconsistent with the language of Section 2(a). We turn now to the merits of the case and the relevant facts.

V.    The Merits.

A.    Petitioner.

Petitioner is a social critic and political activist who, in approximately 1986, began to organize and conduct anti-abortion protests under the name OPERATION RESCUE.[7] On October 14, 1988, he filed a business certificate in Broome County, New York, stating, "I hereby certify that I am conducting or transacting business under the name or designation of Operation Rescue."[8] Demonstrations organized by Petitioner involved a characteristic tactic: a "sit-in" involving sufficiently large numbers of activists to block the entrances of abortion clinics, for the purpose of dissuading clients of such clinics from entering the clinics for counseling or medical procedures.[9] A successful demonstration typically entailed mass arrests of the demonstrators.[10]

---

[6] The Board may take judicial notice of dictionary definitions, *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594, 596 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983)

[7] Terry I 13:10-15.

[8] Terry I, Ex. 1.

[9] *Id.* 157:18-159:8; "Terry, Randall A.," CURRENT BIOGRAPHY YEARBOOK (1994), pp. 589-590, P-NOR, item 72.

[10] Terry I 26:11-15; 28:10-23.

Cancellation No. 92047809

Petitioner successfully encouraged activists across the United States to organize and hold similar demonstrations. Petitioner intended that such demonstrations should be "fully autonomous," rather than organized by Petitioner.[11] The organizers of many of such demonstrations used OPERATION RESCUE as an identifying designation, often combined with a geographic indicator, such as OPERATION RESCUE ATLANTA, OPERATION RESCUE CHICAGO, and OPERATION RESCUE BOSTON.[12] Petitioner encouraged the formation of such groups.[13] The autonomous conduct of these regional organizations is confirmed by several witnesses.[14] Regarding the proliferation of autonomous groups, Petitioner testified, "We had long and fierce arguments over this, and I in my heart felt that what was safest for everybody was for everyone to be fully autonomous. ... But the way that I came to grips with it was to say I will surrender the name Operation Rescue to the movement, not those two words standing alone, but those two words used in conjunction with a modifier...."[15]

In late 1989, Petitioner was imprisoned in Georgia for actions related to his protest activities.[16] Upon his release from prison in early 1990, Petitioner "told the press that I was going to lay off my staff and that Operation Rescue was going

---

[11] *Id.* 32:14-22.

[12] *Id.* 213-214.

[13] Petitioner's responses to requests for admission Nos. 488-491, R-NOR 2, Ex. J.

[14] White 11:16; Faustin 7:13-8:1; 9:19-10:4; Benham 7:9-16; Mahoney 19:17-21:22.

[15] Terry I 207:16-208:3.

[16] *Id.* 37:4-17.

Cancellation No. 92047809

underground."[17]  He also encouraged a member of his "inner circle" named Keith Tucci to start a new organization, which was established under the name Operation Rescue National.[18]

After the establishment of Operation Rescue National, Petitioner continued to make public appearances advocating an end to abortion and undertook a wide variety of other activities which, Petitioner maintains, kept him prominently in the public eye.  Some of his activities were unrelated to the issue of abortion; others related either tangentially or directly, to abortion issues.  However, Petitioner testified at length to explain that he does not consider the designation OPERATION RESCUE applicable to political activities other than nonviolent civil disobedience events at abortion clinics for the purpose of rescuing a baby.[19]  Many of Petitioner's activities from 1992 to the time of trial would not meet his definition of an OPERATION RESCUE event.   The record shows that Petitioner hosted a "five-day a week live radio show."[20]  He demonstrated at the Democratic and Republican National Conventions (1992, 2004 and 2008).[21]  He twice ran for the U.S. House of Representatives (1994 and 1998).[22]  He led a sit-in at Newt Gingrich's office (1995).[23]  He organized demonstrations at Barnes & Noble bookstores against the

---

[17] *Id.* 41:9-11.

[18] *Id.* 42:6-13.

[19] *Id.* 157:18-159:8.

[20] *Id.* 49:4-50:5.

[21] *Id.* 53:22-54:2; 65:10-13;69:13-19.

[22] *Id.* 56:14-24.

[23] *Id.* 51:13-19.

Cancellation No. 92047809

sale of books of photography by Jock Sturges (1996 or 1997).[24] He protested against the United States' affording most-favored-nation status to China; and led a delegation of protesters to Hong Kong (1996).[25] He protested in Hawaii against same sex marriage (1996 or 1997).[26] He protested against Hillary Clinton's candidacy for U.S. Senate and against homosexual marriage (2000).[27] He organized protests against stem cell research (2001).[28] He staged a debate regarding the Supreme Court case *Roe v. Wade* (2001 or 2002).[29] He advocated against the cessation of life support for Terri Schiavo (2003 and 2005).[30] He counterprotested at a demonstration for women's rights in Washington, D.C. (2004).[31] He ran for the Florida State Senate (2006). He became a full-time student and completed his bachelor's degree (ending 2006).[32] He participated in a 20th anniversary celebration of an Operation Rescue protest in Philadelphia (2007).[33] He campaigned against the election of Barack Obama (2008).[34] He traveled to Rome "to complain about Catholic bishops"; protested against Notre Dame University for inviting President Obama to speak; protested against the nomination of Sonia Sotomayor to

---

[24] *Id.* 42:1-24.

[25] *Id.* 55:1-7.

[26] *Id.* 55:17-19.

[27] *Id.* 61:9-12.

[28] *Id.* 62:2-4.

[29] *Id.* 62:19-22.

[30] *Id.* 62:24-64:23; 65:18-67:22.

[31] *Id.* 64:24-65:9.

[32] *Id.* 66:24-67:1; 68:5.

[33] *Id.* 68:16-17.

[34] *Id.* 69:20-22.

Cancellation No. 92047809

the Supreme Court; and protested against passage of the Affordable Care Act (2009).[35]    Throughout his career, Petitioner promoted himself as "the founder of Operation Rescue."[36]

Although Petitioner maintains that, after the establishment of Operation Rescue National by Keith Tucci, he continued to make use of the designation OPERATION RESCUE in connection with protests at abortion clinics and also advised Operation Rescue National as to its operations, the extent to which he continued to be involved in the leadership of any organized movement is controverted in the record.  Petitioner has admitted that he "was not the leader of any entity or organization doing business under a name which included the OPERATION RESCUE mark" from 1996 through 2005.[37]    According to Patrick Mahoney, who became involved with Petitioner's organization at least as early as 1989 and served for a time as the group's national spokesperson, the establishment of Operation Rescue National marked the end of Petitioner's leadership of the movement: "Keith Tucci became head of what would be known as Operation Rescue National and large events in which Operation Rescue groups joined together, Randall from the late spring – I mean, early spring no longer had anything to do with it.  So from the spring of 1990 until January 28th of 2001, Randall Terry no longer had any editorial control or anything with Operation Rescue."[38]

---

[35] *Id.* 69:25-70:3; 70:4-22; 71:6-8; 71:9-20.

[36] *Id.* 70:25-71:1.

[37] Petitioner's responses to requests for admission Nos. 444-456, R-NOR 2, Ex. J.

[38] Mahoney 43:1-9; *see also* 39:19-21;46:5-8; Faustin 10:10-19; 15:15-17.

16

Cancellation No. 92047809

In 1999, events relating to Petitioner's divorce from his wife led to a philosophical break between Petitioner and the leadership of Operation Rescue National. Philip L. Benham, the current director of Operation Save America (the successor to Operation Rescue National), testified that Petitioner has no current position in the organization and will not be offered one;[39] that "There is no way" that Petitioner could head the organization;[40] and that Petitioner did not speak at and was not invited to major events of Operation Rescue National in 2001 and 2008.[41] The break led to written rebukes directed to Petitioner by members of the movement, which were disseminated by Operation Rescue/Operation Save America.[42] Efforts of Petitioner to raise funds within the movement met with severe criticism, also disseminated by Operation Rescue/Operation Save America.[43] We hasten to add that we give no consideration to the truth or falsity of allegations or commentary relating to Petitioner's personal life; but we consider the evidence for what it shows on its face with respect to the perceptions of individuals and the public.

---

[39] Benham 66:20-67:1

[40] *Id.* 68:21.

[41] Id. 70:11-16. The 2001 event was the 10-year anniversary of the "Summer of Mercy" event in Wichita, Kansas. The 2008 event was in Atlanta.

[42] Benham, Registrant's Ex. 3, "Please Pray for Randall Terry."

[43] Benham, Registrant's Ex. 4, "Randall Terry – an Unscrupulous Pitch"; Registrant's Ex. 5, "World Magazine Exposes Randall Terry"; Registrant's Ex. 6, "Please Remove Randall's Feeding Tube"; Registrant's Ex. 7, "Fraudulent Email is Not from Flip [Benham]."

Cancellation No. 92047809

B.    <u>Operation Rescue National</u>.

The establishment of Operation Rescue National in 1990 was considered, at least by some, as a continuation of the movement created by Petitioner and a passing of authority from Petitioner to Keith Tucci.[44] Thereafter, in February 1994, Philip L. Benham succeeded Tucci as director of Operation Rescue National.[45] According to Benham, Petitioner had, at the time of trial, no official position or title within Operation Rescue National, but was "the founder."[46] Benham acknowledged that his organization was not exclusive in its use of OPERATION RESCUE. "[W]e call ourselves Operation Rescue National, so that all of the local affiliates could call themselves like Operation Rescue Alabama, Operation Rescue Buffalo, et cetera, et cetera. There's a lot of autonomy in the local groups. However, Operation National was the national director and I was the national director of that."[47]    Under Benham's leadership, Operation Rescue National apparently incorporated under the name Life Choices and then changed its name to Operation Save America,[48] presumably in early 1999.[49] The organization continued to sometimes identify itself as "Operation Rescue/Operation Save America."[50]    Benham acknowledged that "a

[44] Benham 6:13-16; Mahoney 39:3-6; Steiner 22:2-6.

[45] Benham 6:13-16 ("My understanding is that Randall Terry was the founder of Operation Rescue. He passed that baton to Keith Tucci, who in turn passed it to me in February of 1994." *See also* 42:2-4.

[46] *Id.* 43:3-5.

[47] *Id.* 7:9-16.

[48] Id. 36:17-38:17.

[49] The change of name was reported on April 26, 1999, "Operation Rescue Changes Name," <u>Watertown Daily Times</u> (NY), R-NOR C-14.

[50] Benham 43:9-11.

Cancellation No. 92047809

whole list" of other organizations using the OPERATION RESCUE name existed even as late as the date of his 2010 deposition, including "Operation Rescue Alabama, Operation Rescue Dallas/Fort Worth,... Operation Rescue Rochester, Operation Rescue Colorado."[51]

C.    Registrant.

Inasmuch as there are no trademark claims before us, we have no need to consider in any way Registrant's competing claims to the mark or name OPERATION RESCUE or, indeed, any right of Registrant at all (other than Registrant's right to maintain his registration).  This case must rise or fall upon an analysis of Petitioner's claim to OPERATION RESCUE as a name or identity. However, some information relating to Registrant is relevant to the issues before us.

Among the many autonomous regional organizations that existed in the period between 1988 and 1990 was Registrant's organization "Operation Rescue in San Diego."[52]  Registrant later became involved, beginning in the mid-1990s, with organizations called Operation Rescue California and Operation Rescue West, apparently founded by Jeff White.[53]

In 2001, Registrant was introduced to the leadership of Benham's organization.[54]  Benham knew of Registrant's activities as early as 1996, including

---

[51] Id. 78:4-8.

[52] White 22:17-20.

[53] White 25:4-20; 53:22-54:1.

[54] Benham 23:15-17.

Cancellation No. 92047809

his association with Jeff White.[55] White was well known to Benham, but by the time Benham met Registrant, White was *persona non grata*. White had been National Tactical Director of Operation Rescue National under Keith Tucci from 1990 or 1991. He was ejected, apparently twice; once in 1994 because of comments he had made to the press; and again at a later date due to disagreements over the role of violence in the organization.[56] Benham acknowledged acquiescing to White's use of OPERATION RESCUE WEST. "Certainly, the Operation Rescue California was there when I was made leader in February of 1994. And Jeff White asked me to remember in 1995 if he might use Operation Rescue West. For reasons of insanity on my part, I let him do that. And it was a mistake. An error on my part."[57]

Registrant became involved, as an unpaid "missionary," not an employee, in activities of Operation Rescue/Operation Save America in Wichita, Kansas beginning in 2001, in connection with which Registrant moved with his family from California to Wichita in 2002. Registrant's activities in Wichita, in connection with which he was using the name Operation Rescue West, were "a disaster," according to Benham, apparently because of "theological differences concerning the Doctrine of Blood Guilt."[58] Benham proposed that Registrant work for Benham's organization in other locations, but Registrant declined. "He was bound and

---

[55] Benham 21:16-25; 23:2-9.

[56] White 30:12-19; 31:2-16; 32:5-21.

[57] Benham 22:3-8; 75:21-22.; *see also* Thomas 7:20-22.

[58] Benham 28:14-29:7; 76:9-22.

Cancellation No. 92047809

determined that he was going to stay right in Wichita. ... Troy was just going to do whatever he was going to do from there. He was under no one's authority but his own."[59] "I didn't want him to use Operation Rescue at all, but of course, I had given him – given Jeff White the name Operation Rescue West, so he was going to continue with that."[60]  In 2006, it was reported that Petitioner's organization had purchased the premises of a closed abortion clinic in Wichita, with the financial assistance of the daughter of Jeffrey White, in order to establish Operation Rescue headquarters there.[61]

D.    Discussion.

The question before us is whether, as of December 5, 2006 (the date on which the involved registration issued), OPERATION RESCUE falsely suggested a connection with Petitioner.  Neither party has cited any precedential case in which a natural person successfully asserted a right of privacy or publicity in the name of a business organization with which he was once associated.  However, there is no reason why the name of an organization may not be sufficiently strongly associated with one of its leaders as to suggest a "connection" within the meaning of Section 2(a).  Petitioner rightly points out that the courts and Board have taken a wide-ranging view of the types of indicia that may be entitled to protection as an

---

[59] Id. 30:1-4; 30:9-18.

[60] Id. 32:22-25.

[61] Szostak I, Ex. 7, "Abortion foe to turn former Wichita clinic into offices," The Hutchinson News, July 14, 2006.

individual's identity or persona.[62]  Petitioner argues that his status as "the founder" of the organization OPERATION RESCUE, his high-profile activism under that name over a substantial period of time, and the substantial degree of press and public notice that he has achieved under that name demonstrate that the words OPERATION RESCUE have become his identity or persona.  Registrant, in turn, denies that OPERATION RESCUE was, at the relevant times, Petitioner's name or identity and that even if all evidence is considered in the light most favorable to Petitioner (which is not the appropriate standard for determining facts after trial), "the most that could be said is that [Petitioner] has shown that he founded and once led an organization called Operation Rescue, and that articles concerning him often mention that fact."[63]

We need not make a separate finding as to whether OPERATION RESCUE constitutes Petitioner's name or identity, because even if it is Petitioner's name, a protectable interest in it does not arise under Section 2(a) unless it points uniquely and unmistakably to Petitioner.  *McDonnell Douglas Corporation v. National Data Corporation*, 228 USPQ 45, 48 (TTAB 1985), citing  *Buffett v. Chi-Chi, Inc.*, 226 USPQ 428, 429 (TTAB 1985).  Accordingly, we will turn to this question, which the Federal Circuit considered "the initial and critical requirement" of an analysis under Section 2(a).  *Notre Dame*, 217 USPQ at 509.  The record contains evidence of

---

[62] Petitioner's brief at 23-25, citing *Carson v. Here's Johnny Portable Toilets, Inc.* 218 USPQ 1 (6th Cir. 1983); *Motschenbacher v. R.J. Reynolds, Inc.*, 498 F.2d 821 (9th Cir. 1974); *Waits v. Frito-Lay Inc.*, 23 USPQ2d 1721 (9th Cir. 1992), and others.

[63] Registrant's brief at 29.

Cancellation No. 92047809

a number of factors suggesting that the name OPERATION RESCUE does not point uniquely and unmistakably to Petitioner.

1.    The OPERATION RESCUE movement as a collective phenomenon.

The OPERATION RESCUE movement was not an individual endeavor of Petitioner, but a movement of activists. Petitioner testified, "My short-term goal was to create a movement that rivaled and maybe even exceeded the civil rights movement of the 1960s. My goal was to gather people by the hundreds and if possible by the thousands in front of abortion clinics…." Terry I 12:5-11. The movement made its strongest impact on the general public by means of public demonstrations involving large numbers of activists who would block the entrances of abortion clinics, often resulting in arrests of many of the demonstrators. Regarding an early demonstration in Cherry Hill, New Jersey, Petitioner testified:

> … people streamed to the front door of the abortion clinic and sat down. My memory is that we had close to three hundred people on the ground blocking the doors. … The police arrived shortly after seven and told us we had to move. … They began to arrest people. By 6 o'clock that evening they had arrested two hundred and ten people. It took all day.

Terry Dep. I, 22:8 – 23:1.

The perception of OPERATION RESCUE as a movement of activists who subjected themselves to arrest in public demonstrations is repeatedly illustrated in the record:

> The national publicity drawn by Operation Rescue escalated during the following months…. Between June and October 1988, 1235 people were arrested in twenty-four separate "rescues."
> …

Cancellation No. 92047809

> As Operation Rescue leaders, seasoned in Atlanta, recruited new activists in numerous cities, the membership climbed, eventually reaching an estimated one hundred thousand.

Current Biography Yearbook 1994, "Terry, Randall A.," p. 592.[64]

> Fifty-three members of the group leading the demonstrations, Operation Rescue, were arrested at Midtown Hospital, 12 at the Atlanta Women's Medical Center on the northside and four at the Atlanta SurgiCenter in midtown.... The group will continue pressing for the release of the jailed demonstrators....

"69 More Opponents of Abortion Jailed in Atlanta Protests," The New York Times, August 7, 1988.[65]

References to OPERATION RESCUE as a "group" having "members" indicate a perception that OPERATION RESCUE is an entity separate from the person of Petitioner. The plural reference to "Operation Rescue leaders" shows an association of some leaders other than Petitioner with the name.[66] It is also difficult to escape the conclusion that the public, to some extent, associated the name OPERATION RESCUE with the individual activists of the movement who participated in demonstrations under that name and subjected themselves to arrest for their involvement.

---

[64] P-NOR 2, item 72.

[65] Id., item 1.

[66] See also Steiner, Ex. 1, "The Rhetoric of Operation Rescue," p. 8 (reference to "Operation Rescue leader Flip Benham" in 1994) and p. 11 (reference to "Operation Leader Keith Tucci" in 1993).

Cancellation No. 92047809

2.    <u>Strategy to decentralize the movement.</u>

The evidence shows, as discussed above in Part V(A), that between 1988 and 1990 there was a proliferation of autonomous groups undertaking clinic protests under names that incorporated the name OPERATION RESCUE, often combined with a geographic indicator. This proliferation may have been motivated, in part, by the desire to expand the movement and disseminate its message as far as possible. Petitioner admits in his brief that "Terry also permitted other organizations to adopt names such as Operation Rescue Boston, Operation Rescue Southern California, or the like when the name was joined with a geographic term, as long as the name Operation Rescue alone was his."[67] However, the record also shows that Petitioner consciously promoted a decentralized structure for the movement for other reasons. The activities of the OPERATION RESCUE movement gave rise to a number of civil and criminal legal actions against particular activists and against the organization. Petitioner testified that he promoted decentralization in order to avoid or reduce exposure to liability for acts committed by others under the name OPERATION RESCUE. One of the purposes of establishing Operation Rescue National was to create a formal separation between the new organization and liabilities relating to Petitioner and his past operations. Petitioner testified:

> And it also helped him [Keith Tucci] with our legal theory
> that he was not the successor of an organization and that,

---

[67] Petitioner's brief at 22, citing Hirsh 74-75.

Cancellation No. 92047809

> therefore, my lawsuits did not automatically transfer to
> him when he started Operation Rescue National.

Terry I, 87:16-20.

Under cross-examination, Petitioner testified further:

> So, my point in this was, and I think that I discuss it later
> in the testimony, that the rescue movement and ... how
> many groups there are, such as Operation Rescue Atlanta
> or Operation Rescue Boston or Operation Rescue
> California. There were groups doing things in the name
> of Rescue regularly, and I could not be held accountable
> for their actions. That was the issue. We were constantly
> trying to avoid conspiracy charges in criminal court and
> federal lawsuits for actions that I had not undertaken or
> approved or authorized.

Id. at 197:6-18.

> Those were the key reasons that Operation Rescue never
> incorporated, because if I had an incorporation with the
> board, lawyers told me repeatedly: "Every member of that
> board you are putting in jeopardy."
>
> Q     So would it be correct to say that it was a deliberate
> decision to leave the local groups as autonomous as
> possible?
>
> A     Yes.
>
> Q     And not exercise your direct control over them?
>
> A     Yes.

Id. at 213:10-23.

The proliferation of autonomous groups therefore appears to be part of an

intentional "legal theory." Petitioner testified that during the time of his

involvement with Operation Rescue, he was aware of such groups having names

that included OPERATION RESCUE combined with the terms California, Atlanta,

Cancellation No. 92047809

Idaho, San Francisco Bay Area, Chicago, Milwaukee, Boston, West, National, and

Binghamton.[68]  *Id.* at 214:1 – 215:1.  According to Mahoney, around 1989:

> [D]uring that time period, out of Binghamton, New York, there was a ... headquarters which Randall had started ... and suddenly across the country all these groups started being involved in rescue.  And Operation Rescue became this moniker, this sort of brand name for people who peacefully sat at abortion clinics.
> ...
> [A]ll the groups were autonomous.  In other words, it was structured that way because one of the phrases that we always said, we were never an organization; we were a movement. ...  So these rescue groups were autonomous, and they were just springing up like wildfire, which we loved.  The only caution that we had was that people had to be nonviolent....  But an Operation Rescue group in Boston, let's say, or in Phoenix, let's say, had no connection, outside of ideologically, the Operation Rescue, dba of Randall Terry, and that's the way everybody wanted it.[69]

According to Benham, the existence of such autonomous organizations persisted up

until trial.[70]

We may reasonably conclude that Petitioner's intentional efforts to detach

himself from others who were acting under the name OPERATION RESCUE

succeeded to some extent, such that the public saw the name OPERATION

RESCUE pointing to other groups, to leaders of other groups, and to activists

participating in such groups.

---

[68] Even though Petitioner began his own operations in Binghamton, New York, he testified that an operation called Operation Rescue Binghamton existed under the leadership of Gary Leber "separate and apart" from Petitioner's own operations and during the time of Petitioner's leadership of Operation Rescue.  Terry I at 214-215.

[69] Mahoney 19:17-21:22.

[70] Benham 77:21-78:16.

Cancellation No. 92047809

3.    Petitioner's theory regarding OPERATION RESCUE *alone*.

Petitioner has argued that his intention and plan, in allowing others to use the designation OPERATION RESCUE in connection with regional indicators such as ATLANTA and NATIONAL, was to reserve for himself the designation OPERATION RESCUE *alone*.[71]    Petitioner contends that the proliferation of third-party uses of designations that include OPERATION RESCUE does not detract from the unique and unmistakable manner in which OPERATION RESCUE *alone* points to him.  This argument is not persuasive.

First, it cannot be denied that the designation OPERATION RESCUE was being used by uncontrolled third parties; the addition of regional indicators to the designation does not diminish the fact that the designation was being used.

Further, the added regional indications, in themselves, have very weak power, if any, to distinguish a regional name from other regional names, or a regional name from OPERATION RESCUE *alone*.  Under the common law and under the Trademark Act, geographic designations are not distinctive unless they have acquired secondary meaning.  *See* 15 U.S.C. §§ 1052(e)(2) and 1052(f).  If the designation OPERATION RESCUE had a nationwide reputation, it would be substantially stronger as a source indicating designation than any added geographic indicator such as the name of a city or a regional term such as NATIONAL, ATLANTA, or WEST.  Insofar as the combined designations were in the hands of uncontrolled third parties, the designation OPERATION RESCUE no longer served

---

[71] Petitioner's brief at 22.

as a unique identifier for Petitioner (if it ever did).   According to Petitioner, the aspect of Petitioner's designation that distinguishes it from all others is nothing more than the blank space after the word RESCUE.  The *absence* of matter is too subtle a feature to function as *distinctive* matter, at least in this case, just as the *addition* of geographic terms to OPERATION RESCUE did not transform those words into distinguishably different marks.  It is apparent that Petitioner's plan to reserve for himself the *absence* of a geographic indicator, while freely permitting uncontrolled third parties to use the entirety of his claimed name as the only distinctive matter in their respective names, leaves little, if anything, that points uniquely and unmistakably to him.

Finally, the record demonstrates the strong inclination of people in the marketplace and the press to elide the names of regional groups such that the added regional term disappears and only OPERATION RESCUE remains.  The record shows that Registrant's group, Philip Faustin's group, Tucci and Benham's group, Jeffrey White's group, and other regional groups have been referred to as "Operation Rescue," whether through natural elision or through error.  *See* R-NOR C-25;[72] R-NOR C-28;[73] R-NOR E-7;[74] R-NOR E-17;[75] R-NOR D-6.[76]   Petitioner's

---

[72] "Abortion protests targeted County eyes ban on home pickets," The Denver Post, May 19, 2000.

[73] "Activists Hail Nebraska Law Court Ruling," Rocky Mountain News, June 29, 2000 ("Philip Faustin, executive director of Operation Rescue").

[74] "California orders HMOS to cover 'morning-after' pill," CNN.com (2002).

[75] "Operation Rescue files grand jury petition," The Wichita Eagle, April 8, 2006.

[76] "The Roots of Terror – A special report; Is Abortion Violence a Plot? Conspiracy Is Not Confirmed," The New York Times, June 18, 1995.

Cancellation No. 92047809

witnesses Philip Benham and Rusty Lee Thomas have made the same elision. Benham 43:20; 55:25-56:1; 71:25; 90:12; Thomas 5:4-5. According to Mahoney, the media and the public referred to independent regional organizations as "Operation Rescue," regardless of such organizations' use of other names:

> Q    So you're saying that there were groups that had no formal connection to Randall Terry's organization that might not even have had Operation Rescue in the name, yet the media would still refer to them by the name Operation Rescue?

> A    Oh, that was the case all across the country. When groups did something that involved peaceful sit-ins at abortion clinics, it was always Operation Rescue. That's how they were referred to, whatever their name was, and some of the groups did incorporate under whatever. We were incorporated under Rescue South Florida.

> Q.    Okay. Do you know what the group in Boston, what name they operated under?

> A    Operation Rescue.

> Q    Just Operation Rescue by itself?

> A    Yeah. And there were a couple other groups in Phoenix, in, I think, Phoenix, somewhere in Arizona, and across the country that were just Operation Rescue, and what happened more times than not you had a number of groups that actually had no kind of leadership structure, and they just formed spontaneously as Operation Rescue and would go do a sit-in.

Mahoney 23:14-24:15.

> Q    Now, even though the organization's name was Operation Rescue National, was it ever referred to simply as just Operation Rescue?

> A    All the time. Nothing changed on that. It could have been called, you know, Plan Nine from Outer Space, and the media still would have referred to it as Operation Rescue because that became just a common denominator.

Cancellation No. 92047809

> Any time there was a sit-in at an abortion clinic, the
> media always referred to it as Operation Rescue.

Mahoney 47:20-48:7.

As is illustrated above, Petitioner's theory of limited sharing of the name
OPERATION RESCUE did not preserve for him the type of unique and
unmistakable association with the name that would be required under Section 2(a).
The record shows that other abortion protest groups and their members have called
themselves OPERATION RESCUE and the press has referred to other groups in
that manner. Whether or not such uses were correct, the public has been exposed to
them, raising a strong inference that OPERATION RESCUE is not a term that
points uniquely to petitioner.

4.    <u>The perceived separation of Petitioner from Operation Rescue.</u>

In early 1990, upon release from a period of imprisonment, Petitioner "told
the press that I was going to lay off my staff and that Operation Rescue was going
underground." Terry Dep. I 41:9-11. At approximately the same time, Operation
Rescue National, under the leadership of Keith Tucci, came into being.

Although Petitioner denies that he ceased operations under the name
OPERATION RESCUE (Terry I 41:18-23), this reorganization was widely reported
as a departure of Petitioner from leadership of the Operation Rescue movement.
"Terry stepped down last spring as the director of Operation Rescue, though he still
is active as a consultant to the group."[77] "Anti-abortion activist Randall Terry said

---

[77] "Abortion foes decide to try another tactic," <u>The San Diego Union</u>, August 19, 1990, at R-
NOR, item D-1.

Cancellation No. 92047809

today in Washington, D.C., that the Operation Rescue he founded is closing its headquarters because of debt but that local affiliates nationwide will continue their activities."[78] "The national Operation Rescue organization is shutting down because of debt but local affiliates nationwide will continue their pro-life efforts, founder Randall Terry said yesterday."[79] "The founder of the militant anti-abortion group Operation Rescue said today that the group would close its headquarters because of debt but that its affiliates nationwide would continue their activities."[80] "Randall Terry, founder of the anti-abortion group Operation Rescue, has announced last week that he is stepping aside from the group's day-to-day operations to promote a new strategy.... [H]e decided to turn the 'hands-on' operation of the group to Keith Tucci, 33, former regional director for the Midwest."[81] Clearly the press — and thus the public — received the impression that responsibility for the activities of the group were passing from Petitioner to "local affiliates nationwide" or to a new leader named Keith Tucci. This impression carried with it the perception that Petitioner and OPERATION RESCUE were separate entities, and that, with respect to the organization, Petitioner was moving from the inside to the outside.

---

[78] "Debt Closing Operation Rescue's Base, Founder Says," <u>The Seattle Times</u>, January 31, 1990, at R-NOR, C-2.

[79] "Fine forces closure of Operation Rescue," <u>The Pantagraph</u> (Bloomington, IL), February 1, 1990, at R-NOR, C-3.

[80] "Anti-Abortion Group to Close Headquarters," <u>The New York Times</u>, February 1, 1990, R-NOR, C-4.

[81] "Anti-Abortion Leader To Change Strategy," <u>The Seattle Times</u>, April 15, 1990, R-NOR, C-5.

Cancellation No. 92047809

The perception that Petitioner separated from the Operation Rescue movement in 1990 persisted in later years: "In 1989, Terry left Operation Rescue...."[82] "[Operation Rescue's] founder, Randall Terry, largely retreated from public life since the aggressive protests of the 1980's and early 90's. He broke with the group, and later ran for Congress."[83] "He was replaced in 1991 as the leader of Operation Rescue...."[84] "A Sept. 12 Page One article ... incorrectly described Terry's relationship with the antiabortion group Operation Rescue. He co-founded and headed the group but is no longer part of it."[85] "Though no longer affiliated with the organization, Terry is the founder of Operation Rescue, one of the leading pro-life Christian activist groups."[86]

The perception that the 1990 transition ended Petitioner's leadership of OPERATION RESCUE was also shared by some involved members of the group. Registrant's witness testified:

> [I]t became clear that the leadership team was a bit in tatters. ... [S]o we had a meeting in late, late winter/early spring in 1990 in Binghamton, New York, and we all gathered there. ... [A]nd at that meeting several important decisions were made. One, Randall stepped down from Operation Rescue, and Operation Rescue dba Randall Terry no longer existed. That was number one. Number two, Operation Rescue dba Randall Terry

---

[82] "Randall Terry's Latest Protest Targets Giuliani," The Post Standard (Syracuse, NY), January 22, 2008, R-NOR, D-27.

[83] Times Topics, "Operation Rescue," The New York Times, updated June 1, 2009, R-NOR, D-32.

[84] "Anti-Abortion Activist Kicks Off Tour in Roanoke," The Roanoke Times, August 22, 2009, R-NOR D-30.

[85] "Corrections," The Washington Post, September 16, 2010, R-NOR, D-33.

[86] "Anti-abortion activist to run for president," <wtol.com>, January 21, 2011, R-NOR, D-34.

Cancellation No. 92047809

> morphed into Operation Rescue National, with the
> director being Reverend Keith Tucci....Three, those who
> were involved in the leadership team that Randall felt
> misrepresented him on this letter that sent out were
> removed from a leadership role at that time, and Keith
> put together his own team.

Mahoney 38:15-39:10.

Several of Petitioner's witnesses confirmed that, in their perception, Petitioner had

no authority over Keith Tucci in the management of Operation Rescue National.

*See* Moore 24:2-15; Costello 19:13-20:11; Thomas 23:17-23.

After 1990, even though Petitioner made appearances at some Operation

Rescue events, he was perceived by some as not connected to the organization. "We

planned a rally where he was a speaker.... Maybe somewhere around '92, '93. ...

"He wasn't involved in Operation Rescue at that point."[87]  "[I]t seemed like in the

early '90s, he kind of faded off and was involved in some different things of his

own."[88]  "Keith Tucci became head of what would be known as Operation Rescue

National and large events in which Operation Rescue groups joined together,

Randall from the late spring – I mean, early spring no longer had anything to do

with it.  So from the spring of 1990 until January 28th of 2001, Randall Terry no

longer had any editorial control or anything with Operation Rescue."[89]

The evidence relating to the 1990 transition indicates that, as a result of the

creation of Operation Rescue National and Petitioner's change of position with

respect to the movement, Petitioner and OPERATION RESCUE were perceived as

---

[87] Faustin, 10:10-19.

[88] *Id.* 15:15-17.

[89] Mahoney 43:1-9.

Cancellation No. 92047809

different entities; and the name OPERATION RESCUE was associated with a new organization, a new leader (Tucci), and new staff members (those appointed by Tucci).

5.    <u>Petitioner's denial of his identification with Operation Rescue.</u>

The record contains evidence that, at times, Petitioner himself promoted the perception that he was separate from the movement called OPERATION RESCUE. This is primarily apparent in Petitioner's filings in connection with the law suit *National Organization for Women, Inc. v. Scheidler et al.*, (No. 86-C-7888, N.D. Ill.), in which Petitioner and Operation Rescue were both named as defendants.  In an affidavit filed January 21, 1997, Petitioner stated, "In the late 1980's and early 1990's, the term 'Operation Rescue' or 'rescues' became synonymous with  grass-roots segments of the pro-life movement. ...  [M]any isolated groups around the country began sporadically conducting peaceful sit-ins.... 'Rescue' pro-life groups began springing up all over the country.  These groups and organizations had no formal ties or association (except in name only) with the Operation Rescue in Binghamton, New York.)"[90]  Similarly distancing statements were set forth in Petitioner's 1990 answer in that case: "Mr. Terry neither coordinates nor is involved with the majority of activities done under the slogan or name 'Operation Rescue'. Mr. Terry answers the complaint in his own name....  He does not have information about and cannot answer for all activities done under the slogan of 'Operation

---

[90] Brejcha, Ex. 2, internal exhibit A, ¶10.

Cancellation No. 92047809

Rescue'."[91]  In Congressional testimony of 1993, Petitioner again drew a distinction between himself and the movement called "Operation Rescue":  "I cannot speak for Operation Rescue California. ... I am the founder of Operation Rescue.  The name has become synonymous with the movement."[92]

These statements of Petitioner, which acknowledge third-party activities conducted under the name OPERATION RESCUE and argue that Petitioner should not be identified with the OPERATION RESCUE movement, weigh against a finding that this designation points uniquely and unmistakably to Petitioner.

6.    Criticism of Petitioner by Operation Rescue National.

As noted above in Part V(A), Petitioner's separation from his wife in 1999 led to harsh, public criticism of Petitioner by certain religious figures and, more importantly, by Philip Benham, the director of Operation Save America.  As Operation Save America was regarded by many to be the successor to Petitioner's OPERATION RESCUE organization (and at times identified itself as "Operation Rescue/Operation Save America"), such criticism was  characterized in the press as a serious break between Petitioner and the Operation Rescue movement.  "Randall has been confronted with his sin time and again by Flip Benham, leaders of Operation Rescue/Operation Save America, and his pastor of sixteen years – all to no avail."[93]  "Some opponents dismiss Terry as a right-wing has-been, as does the current director of Operation Rescue. ... 'He's no viable voice,' said the Rev. Flip

[91] Brejcha, Ex. 1, Preface.

[92] Terry, Ex. R-6.

[93] "Fraudulent Email is Not from Flip," www.operationsaveamerica.org, Benham, Registrant's Ex. 7.

Benham, director of Operation Rescue/Operation Save America. ... 'Randall Terry is an unrepent ant [sic] sinner.'"[94] "Terry founded the national Operation Rescue in the 1980s, but left the organization a few years ago. ... Terry's successor in Operation Rescue, now renamed Operation Save America, the Rev. Flip Benham, has been critical of Terry."[95] "Terry dropped out of the national spotlight about five years ago, amid a divorce from his first wife. Some of his supporters turned their backs.... A pastor who replaced Terry in the Operation Rescue/Operation Save America group called him 'an unrepentant sinner.'"[96] "Ms. Schiavo's parents invited Randall Terry, the founder of Operation Rescue, who is estranged from the group, to help organize rallies and protests for their cause."[97] "The Rev. Flip Benham, who heads the current version of Operation Rescue, said Terry has failed to show 'Godly sorrow' for the breakup of his marriage. 'It's very difficult for him to speak out with any kind of Christian authority with his kind of character flaws.'[98]

Reports of such a rift and of Petitioner's estrangement from the movement that is perceived to be a continuation of OPERATION RESCUE can only be

---

[94] "Abortion Foe Tries for Comeback Fighting Gay Unions," The Wichita Eagle, August 17, 2003. R-NOR D-18.

[95] "Planned Parenthood dismissive of protest tactics," Sioux City Journal, November 22, 2003, R-NOR D-19.

[96] "Operation Rescue founder discards strident approach," <DesMoinesRegister.com>, November 23, 2003, R-NOR D-21.

[97] "Conservatives Invoke Case in Fund-Raising Campaigns," The New York Times, March 25, 2005, R-NOR D-24.

[98] "Longtime Abortion Activist Now a 'Mellowed' Politician," The Palm Beach Post, June 25, 2005, R-NOR C-18.

Cancellation No. 92047809

interpreted as detracting from the likelihood that the public would continue to associate the OPERATION RESCUE designation with Petitioner.

7.    Petitioner as "founder."

The record contains much evidence showing that Petitioner regularly promoted himself as the "founder of Operation Rescue" throughout his career; that members of the movement often acknowledged him as the founder; and that the press often described him as the founder.  This is clearly the association with the movement that Petitioner has most successfully maintained in the public perception.

Such an association is not, alone, sufficient to meet the standards of a claim under Section 2(a).  The word "founder" means "one that founds, establishes, or builds";[99] and "found" means "to establish (as an institution) often with provision for future maintenance : ORIGINATE, INITIATE...."[100]  We find in these definitions clear references to origins and beginnings, but no reference to a necessary continuity of relationship.  There is also no suggestion in these definitions of identity between the founder and the founded institution; rather there is an implication that they are distinct from each other.  Where the evidence indicates that Petitioner has been perceived as the founder of OPERATION RESCUE, we interpret such acknowledgements in a manner consistent with the above definitions.  Such acknowledgments alone do not show a relationship of identity between Petitioner

---

[99] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) p. 898.

[100] *Id.* at 897.

Cancellation No. 92047809

and OPERATION RESCUE continuing up to the relevant time, 2006, when
Registrant obtained his service mark registration.

8.    Petitioner in 2006.

As we have noted, we must determine whether as of December 5, 2006 the
designation OPERATION RESCUE pointed uniquely and unmistakably to
Petitioner.  Neither party has made a focused presentation of evidence relating to
public perceptions of Petitioner as of that time.  We have Petitioner's account that
in 2006 he completed his bachelor's degree, having been a full-time student;[101] and
that he ran for the Florida Senate.[102]  In the previous year he had been engaged in
the dispute over Terri Schiavo's life support.[103]  The press reports of the time that
we have found in the record primarily focus on Petitioner's Florida Senate campaign
or involvement with the Schiavo family, while noting that he was the "founder" of
Operation Rescue.[104]    Some clearly refer to Petitioner's association with
OPERATION RESCUE as being in the past.  "Between 1987 and 1994 Randall
Terry was the leader of North America's largest peaceful civil disobedience
movement, Operation Rescue. ... Terry is now President of the Society for Truth and

---

[101] Terry I 66:24-67:1; 68:5.

[102] Id. 67:25-68:4.

[103] Id. 62:24-64:23; 65:18-67:22.

[104] Terry I, Ex. 25 "Anti-abortion activist signals run for Florida Senate," The Orlando
Sentinel, May 26, 2005; P-NOR 3, item 12, "Activist uses Schiavo case in race for state
Senate," The Orlando Sentinel, April 15, 2006; P-NOR 3, item 14, "Candidate pins Florida
Senate campaign on Web videos," The Orlando Sentinel, July 25, 2006; P-NOR 2, item 32,
"National Briefing: South: Florida: Abortion Foe Plans Campaign," The New York Times,
June 23, 2005; P-NOR 2, item 54, "Long Legal Battle Over as Schiavo Dies; Florida Case
Expected To Factor Into Laws For End-of-Life Rights," The Washington Post, April 1, 2005.

Cancellation No. 92047809

Justice...."[105]  "Founder of the antiabortion group Operation Rescue and currently a Christian activist...."[106]  "[I]t has been several years since his direct pro-life action work...."[107]  "'I don't want to be a protester.  I want to be a statesman.'  ...  In his Operation Rescue days, Terry said, 'Some of my rhetoric was a little too strident....'"[108]  An article about a Supreme Court ruling involving Operation Rescue makes no mention of Petitioner.[109]

We have reviewed all of the 2006 and 2005 excerpts from news items included in Szostak I, Ex. 8.  (There are only four from 2006.)  The excerpts are typically less than 20 (not always contiguous) words in length, and it is extremely difficult to derive useful information from them.  At best, some of these news items show a recognition of Petitioner as the founder of Operation Rescue.  In sum, there is nothing in the evidence to suggest that the designation OPERATION RESCUE pointed uniquely and unmistakably to Petitioner as of the time when Registrant's registration issued.

---

[105] P-NOR 3, item 22, "Randall Terry Converts. (ABORTION MISCELLANEA)," Catholic Insight, July 1, 2006.

[106] P-NOR 2, item 53, "Justices Decline Schiavo Case; Options Dwindle for Those Trying to Keep Florida Woman Alive," The Washington Post, March 25, 2005.

[107] P-NOR 2, item 67, "Pro-life activist Randall Terry converts to Catholicism, still slaying dragons," Catholic Online, May 17, 2006.

[108] R-NOR 1, C-18, "Longtime Abortion Activist Now a 'Mellowed' Politician," The Palm Beach Post, June 25, 2005.

[109] P-NOR 2, item 44, "Abortion Opponents Win Dispute," The New York Times, March 1, 2006.

Cancellation No. 92047809

9.    <u>Conclusion</u>.

The evidence indicates that, throughout Petitioner's career, the designation OPERATION RESCUE was perceived by the public as pointing to a movement involving a large number of persons and institutions besides Petitioner, including other activists, other organizations, and other organizational leaders. The record shows that, to some extent, such a diffuse perception was Petitioner's intention; and to some extent Petitioner even denied his connection with activities performed under the name OPERATION RESCUE. The evidence indicates that Petitioner was perceived by many to have parted ways with the movement or organization called OPERATION RESCUE, and that at times he was perceived to have been rejected by persons associated with the movement. On this record, Petitioner has not shown that the name OPERATION RESCUE points uniquely and unmistakably to him. Without such a showing, his claim that the Registrant's registered mark falsely suggests a connection with him cannot succeed. We need not address other elements of the Board's four-part standard for finding a false suggestion of a connection.

**Decision:**    The petition for cancellation is dismissed with prejudice.

THIS OPINION IS NOT A
PRECEDENT OF THE TTAB

Hearing:                                                                    Mailed:
February 12, 2013                                                           July 10, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Randall A. Terry*
*v.*
*Troy Newman*

————

Cancellation No. 92047809

on Reconsideration

————

Michael S. Culver of Millen, White, Zelano & Branigan, P.C. for Randall A. Terry.

Brian R. Gibbons, Esq. for Troy Newman.

————

Before Mermelstein, Kuczma and Masiello, Administrative Trademark Judges.

Opinion by Masiello, Administrative Trademark Judge:

Randall A. Terry ("Petitioner") has filed a request for reconsideration (cited

herein as "Recon.") of the Board's decision of April 2, 2013 (the "Decision"),

dismissing his petition to cancel U.S. Registration No. 3179591, owned by Troy

Newman ("Registrant"), on grounds that the Board misapplied the law in

determining whether the registered mark OPERATION RESCUE "Consists of or

comprises ... matter which may ... falsely suggest a connection with persons, living

Cancellation No. 92047809

or dead...." 15 U.S.C. § 1052(a). Registrant filed a brief in response, and Petitioner filed a reply brief. Petitioner has also requested an oral hearing on his request for reconsideration.

It is not the practice of the Board to hold an oral hearing on a request for reconsideration. *See* TBMP § 502.03 ("It is the practice of the Board to deny a request for an oral hearing on a motion unless, in the opinion of the Board, an oral hearing is necessary to clarify the issue or issues to be decided. Ordinarily, arguments on a motion are, and should be, adequately presented in the briefs thereon, and therefore the Board rarely grants a request for an oral hearing on a motion.") Petitioner's claims and arguments have been amply aired in his briefs and in an earlier oral hearing before the Board. The Board sees no need for clarification of the issues to be decided. Accordingly, Petitioner's request for an oral hearing is denied.

By way of introduction in his request for reconsideration, Petitioner acknowledges the "four familiar elements" set forth as the standard for a finding of a false suggestion of a connection in *University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., Inc.*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), but argues that the Board "focuse[d] almost exclusively on the second element of whether the mark OPERATION RESCUE points uniquely and unmistakably to Terry." Recon. at 1-2. The Board's four-factor test is not a balancing test whereby a successful showing of one factor may cancel out the failure to show one or more of the other factors. Rather, each of the four factors of the test is a required element

Cancellation No. 92047809

for a finding of a false suggestion of a connection. Accordingly, the Board's finding that Petitioner failed to demonstrate that the designation OPERATION RESCUE points uniquely and unmistakably to Petitioner ineluctably compelled a judgment against Petitioner.[1]  Accordingly, the Board's attention to this factor was fully warranted.

Petitioner also argues that the Board, having observed that it is not inconceivable that the name of an organization might be sufficiently strongly associated with one of its leaders as to suggest a "connection," failed to "make a 'separate finding'" as to this point. Recon. at 2. Yet the Board's entire Decision was dedicated to making a finding on this point.

Petitioner's introduction also argues that the Board failed to "analyze the proof or arguments" relating to Petitioner's fame. Yet the Board's decision devoted more than five pages to a discussion of Petitioner's accomplishments, his renown and his notoriety, with 37 citations to the record. Decision at 12-17. The Board gave due regard to Petitioner's fame in reaching its decision.

Petitioner then enumerates four errors in the Board's analysis of his claim, which we discuss below.

A.    Registrant's "Intent to Usurp" Petitioner's Identity.

Petitioner points to the following guidance in *Notre Dame, supra*:

> This conclusion could be changed if the evidence showed that [defendant] intended to identify the [plaintiff] ....

---

[1] Petitioner's effort to banish from his brief the words "uniquely and unmistakably" by defining the phrase "points to" to mean "points uniquely and unmistakably to" (Recon. at 1, fn1) is a curious one.

3

Cancellation No. 92047809

> Evidence of such intent would be highly persuasive that
> the public will make the intended false connection.

*Notre Dame*, 217 USPQ at 509.

Petitioner urges that we may *infer* Registrant's intent from the fact that the registered mark is identical to OPERATION RESCUE, which is Petitioner's asserted identity. We find that no such inference may fairly be made. Many facts of record interfere with the logic of such an inference, including the fact that there was a proliferation of autonomous groups undertaking clinic protests under names that incorporated the designation OPERATION RESCUE (Decision, Part V(A)); and the fact that the designation OPERATION RESCUE could reasonably be perceived as indicating "not an individual endeavor of Petitioner, but a movement of activists." (Decision at 23.) It is not a foregone conclusion that adoption of the name OPERATION RESCUE demonstrates an intent to suggest a connection with the individual Randall Terry.

As "additional evidence," of intent, Petitioner points to Registrant's purported theory "that he assumed the mantle of leadership to that name with Terry's blessing." (Recon. at 3, *citing* Registrant's trial brief at 15-16 and White Dep. 37:5-9.) However, the "blessing" described at White Dep. 37:5-9 was not conferred by Petitioner alone, but by him together with four others, including someone described as "another national leader." White Dep. 37:6. Petitioner also points to a webpage that Registrant submitted as a specimen of use in his application for registration. Contrary to Petitioner's argument, this webpage does not "illuminate[ ] Newman's intent to claim Terry's legacy...." (Recon at 4.) If anything, the webpage seeks to

4

Cancellation No. 92047809

downplay Petitioner's role in Operation Rescue and recognizes the contributions of others:

> In 1986, a cadre of men including Randall Terry and ORW principle members Rev. Joseph Foreman and Ken Reed, founded Operation Rescue. ... [M]any Operation Rescue organizations cropped up across the country, each autonomous in their leadership, including Operation Rescue of Los Angeles and Operation Rescue of San Diego. These two independent groups were never under the authority of Randall Terry.

*See* Petitioner's trial brief at 44.

Petitioner also urges that the existence of a "financial motive for usurping his name" demonstrates that Registrant must have had the intent to do so. Petitioner points to a news report indicating that the name OPERATION RESCUE carries with it an "unquestionable ability to raise money." (Petitioner's trial brief at 45.) Neither such a news report, nor even evidence that Registrant has engaged in fundraising (*id*. at 45-46), sufficiently illuminates Registrant's state of mind to allow us to find that he intended to usurp Petitioner's identity. We also reject Petitioner's argument that the fact that Registrant did not himself testify in the proceeding should lead to an inference of ill intent. Recon. at 4-5. The burden of proving Petitioner's claim lay with Petitioner; and Petitioner had the option of taking the testimonial deposition of Registrant. Registrant, for his own part, had no duty to testify or submit any evidence, and his failure to do so is not evidence in Petitioner's favor. Neither does the fact that both Petitioner and Registrant engaged in anti-abortion activism compel a finding of intent. Recon at 5, citing *Hornby v. TJX Companies Inc.*, 87 USPQ2d 1411, 1426-27 (TTAB 2008). Where the

Cancellation No. 92047809

record demonstrates that the designation OPERATION RESCUE has been associated with numerous individuals and groups other than Petitioner and his group, the fact that Petitioner and Registrant have engaged in similar endeavors does not indicate Registrant's intent to associate himself with Mr. Terry.

B.    Analysis of Geographic Place Names.

The Board in its Decision was skeptical of Petitioner's contention that the proliferation of third-party uses of OPERATION RESCUE in combination with geographic place names did not detract from the ability of the designation OPERATION RESCUE, standing alone, to point uniquely and unmistakably to himself. Decision at 28ff. Petitioner criticizes the Board for saying, in the context of its discussion of the use of the term OPERATION RESCUE alone, "The *absence* of matter is too subtle a feature to function as *distinctive* matter, at least in this case, just as the *addition* of geographic terms to OPERATION RESCUE did not transform those words into distinguishably different marks." *Id.* at 29. Petitioner seems to take the position that the trademark concept of distinctiveness is entirely irrelevant to an analysis under Trademark Act § 2(a) and that any reference to it renders the Board's analysis erroneous. Recon. at 5-6. Petitioner cites various authorities for the proposition that analysis under Section 2(a) differs from analysis under other sections of the Act, but does not explain why the Board's reference to distinctiveness is contrary to those authorities. *Id.* at 6. The one specific error noted as an example is the requirement, in publicity cases, of a showing of secondary meaning. Recon. at 6, *citing* J. Thomas McCarthy, 1 The Rights of

Publicity and Privacy §5:6 (2d ed. 2012). But the Board has not in any way imposed on Petitioner a requirement that he demonstrate secondary meaning.

Petitioner argues that the names consisting of OPERATION RESCUE combined with a geographic name[2] were inspired by the rescue missions of the group called OPERATION RESCUE that was organized by Petitioner. Recon. at 6. Petitioner compares this situation to *In re White*, 80 USPQ2d 1654 (TTAB 2006), wherein various third-party designations that included the term MOHAWK were found to be "named after" the Mohawk Native American tribe and therefore did not detract from the association of the MOHAWK name with the tribe. We see Petitioner's claim as distinguishable. While the proliferation of groups using OPERATION RESCUE in various parts of the nation clearly suggests that there was copying among such groups as to their names, evidence is lacking to demonstrate that those groups sought to name themselves after Petitioner himself, Randall Terry. Indeed, the intentional decentralization of the anti-abortion movement, with the intention of insulating the various groups from Petitioner himself (for liability reasons) (*see* Decision at 25-27), makes it highly unlikely that the groups intended to name themselves after Petitioner. Any conclusion to this effect is made further unlikely by Petitioner's own efforts to deny his identification with the movement called OPERATION RESCUE (*see* Decision at 35-36); and the disagreements and disputes that sometimes arose between Petitioner and other

---

[2] The record shows that groups existed having names that included OPERATION RESCUE combined with the terms California, Atlanta, Idaho, San Francisco Bay Area, Chicago, Milwaukee, Boston, West, National, and Binghamton. *See* Decision at 26-27.

Cancellation No. 92047809

members of the movement. *See* Terry Dep. 182:18-184:8; and Decision at 19-20; 36-38.

Petitioner also takes issue with the Board's analysis of evidence of uses of the designation OPERATION RESCUE to refer to persons other than Petitioner. Recon. at 7-10. Petitioner's arguments merely second-guess the Board's interpretation and weighing of such evidence rather than stating any specific error. The Board fully considered all of the evidence of record and is not persuaded that it has misinterpreted it in any significant way.

C.    "Flawed Analysis of a Movement."

Petitioner criticizes the Board for using the word "movement" in describing the anti-abortion activism of Petitioner and others. The Board was warranted in using such a term, because the record is replete with references to those activities as a "movement," including Petitioner's own words: "But the way that I came to grips with it was to say I will surrender the name Operation Rescue to the movement...." Terry Dep. I 207:22-24.

Petitioner next contends that the Board failed to address Petitioner's argument that Registrant should be estopped from asserting that Operation Rescue is the name of a movement. Recon. at 10. Petitioner argued in his trial brief that Registrant, in contending "that Operation Rescue identifies the rescue movement as a whole... is arguing that the term Operation Rescue is generic," and that the genericness of the term OPERATION RESCUE is inconsistent with the verified declaration made by Registrant in applying for the registration at issue in this

Cancellation No. 92047809

proceeding. Petitioner's trial brief at 20, *citing* Registrant's trial brief at 34-35, 36. We have reviewed closely Registrant's trial brief at 34-36, and see no use of the word "generic." To this extent, Petitioner's allegation of inequitable conduct is merely a straw man designed to be easily knocked down. The rest of Petitioner's argument depends on a mischaracterization of Registrant's arguments in his trial brief. Registrant's arguments clearly related to the historical uses of the designation OPERATION RESCUE ("The evidence of record clearly states that Operation Rescue was used historically to identify the movement in general." Registrant's trial brief at 34.). The use of a designation by third-parties in the past is not necessarily inconsistent with Registrant's claim, in its application for registration, that he was at the time of application the owner of the mark. We see no merit in Petitioner's argument for equitable estoppel.[3]

Petitioner appears to argue that the roles of other individuals in the organization he founded, the fact that he "disbanded" that organization, the continuation of "[a] *movement* in the pro-life field" under different leadership, and Petitioner's involvement in a variety of activities other than demonstrations at abortion clinics were, in some way, erroneously interpreted by the Board. Recon. at 10-11. Where the error lies remains obscure:

> Terry's separation from or involvement with the successor
> organizations had no impact on Terry's identity which
> remained active with his own supporters, unless one

---

[3] As noted in our Decision, all of Petitioner's claims for cancellation other than his claim under Section 2(a) were dismissed with prejudice pursuant to the Board's order of November 14, 2008. That dismissal included Petitioner's allegation of fraud in procuring the registration.

Cancellation No. 92047809

> accepts, as the Opinion appears to do, that the pro-life
> organization under Tucci and Benham was synonymous
> with the name Operation Rescue as the sole movement in
> the pro-life field.

Recon. at 11.

Nowhere in the Board's decision is there any finding that the organization of Tucci

and Benham was in any sense "the sole movement." The Board clearly concluded,

to the contrary, that the public perceived OPERATION RESCUE "as pointing to a

movement involving *a large number of persons and institutions* besides Petitioner,

*including other activists, other organizations, and other organizational leaders.*"

Decision at 41 (emphasis supplied). Nor was there any need for the Board to make

a finding similar to the purportedly erroneous one. As Registrant notes, "The issue

is not whether Operation Rescue National was perceived as the *only* Operation

Rescue, the issue is whether Tucci's/Benham's organizations were perceived as *an*

Operation Rescue." Registrant's brief at 12.

Finally, Petitioner appears to argue that the Board should have found a false

suggestion of a connection with Petitioner "if more than an insignificant number of

people identify" him with OPERATION RESCUE. Petitioner's Brief at 12, *citing*

*Ross v. Analytical Technology Inc.*, 51 USPQ2d 1269, 1276 n.14 (TTAB 1999).

Registrant correctly points out that *Ross* addressed a claim under Section 2(c), 15

U.S.C. §1052(c), not Section 2(a). Registrant's brief at 2. Petitioner nonetheless

maintains that the analogy between Sections 2(c) and 2(a) is a valid one, because

both are based on the right of publicity. Petitioner's reply brief at 1-2. There is

some overlap in the potential applicability of Sections 2(a) and 2(c), as both may

10

apply to the use of the name of an individual. Nonetheless, we see no need to reconcile the two provisions, because they are manifestly different in their coverage. Section 2(c), by its terms, addresses use of an individual's "name, portrait or signature." By contrast, a false suggestion of a connection under Section 2(a), as interpreted by the cases, may arise from use of a person's name or identity or persona, or a close approximation thereof. *Notre Dame,* 217 USPQ at 508; *Hornby,* 87 USPQ2d at 1424; *In re Jackson International Trading Co.,* 103 USPQ2d 1417, 1419 (TTAB 2012); *Buffett v. Chi-Chi's, Inc.*, 226 USPQ 428, 429 (TTAB 1985). As the two statutory provisions are clearly not co-extensive, it does not matter if their standards of proof are inconsistent. There is no question that, in a case under Section 2(a), we must require that the purported name or identity or persona point *uniquely and unmistakably* to the plaintiff. *Notre Dame,* 217 USPQ at 509. Petitioner's argument that the Ross standard "would complement the inquiry as to whether the mark identifies Terry" (Petitioner's reply brief at 2) is unavailing, because even if OPERATION RESCUE is assumed to be Petitioner's name itself, Petitioner's claim must fail if he cannot establish that it points to himself uniquely and unmistakably. The evidence showed, by a heavy preponderance, that OPERATION RESCUE did not point uniquely and unmistakably to Petitioner.

D.    Analysis of "Founder."

Petitioner finds fault with the Board's interpretation of evidence in which Petitioner was referred to as the "founder" of OPERATION RESCUE. The Board addressed this evidence with attention because, in the Board's view, it was among

the most favorable evidence adduced by Petitioner ("This is clearly the association with the movement that Petitioner has most successfully maintained in the public perception." Decision at 38.) Petitioner contends that the Board "diminishes this use *alone* as insufficient...." (Recon. at 12.) However, the Board clearly did not ignore the other evidence of recognition of Petitioner in the press, as is apparent in the large number of citations to news items in the Decision.

Petitioner next argues that the Board treated "founder of Operation Rescue" as the identity under analysis. Recon. at 12-13. We see nothing in the Decision that could create this impression. The Board analyzed the meaning of "founder" in order to determine whether OPERATION RESCUE pointed uniquely and unmistakably to Petitioner, because this was a word that the press used in describing Petitioner's relationship to OPERATION RESCUE, and because Petitioner himself alleges that he frequently emphasized his role as the founder of the organization to third parties and the press. *See, e.g.*, Terry Dep. I 50:22-51:4, 239:10-25. An understanding of the meaning of "founder" was essential to understanding the meanings of the statements reported in the press.

Petitioner takes issue with the Board's observation that the dictionary definition of "founder" did not include any "necessary continuity of relationship" between the founder and the founded entity. Petitioner suggests that with this observation the Board imposed on Petitioner a requirement that Petitioner demonstrate a "continuity of relationship" with the organization he founded. Recon. at 13-14. There is nothing in the Decision placing such a burden of proof on

12

Petitioner.  Rather, the Board used the dictionary definition for objective guidance in understanding what people meant when they referred to Petitioner as the "founder of Operation Rescue."  With the assistance of the dictionary, the Board found that people's use of "founder" did not necessarily indicate a perception of any continuing relationship, nor a relationship of identity, between Petitioner and OPERATION RESCUE.   Decision at 38 ("Where the evidence indicates that Petitioner has been perceived as the founder of OPERATION RESCUE, we interpret such acknowledgements in a manner consistent with the above definitions.")  If such people meant something else when they said Petitioner was the "founder of Operation Rescue," it was Petitioner's burden to show it.  The burden, however, was not to show that Petitioner had a perpetuity of relationship with an organization; it was to show that the expression OPERATION RESCUE pointed uniquely and unmistakably to himself.

Finally, Petitioner faults the Board for focusing on public perceptions as of 2006 (the date of issuance of the registration at issue, and the date as of which a false suggestion of a connection must be shown), saying that "the Opinion parses out the individual events of that year alone without recognition of Terry's past accomplishments" (Recon. at 14); and also suggesting that evidence of public perceptions after 2006 should have been considered.  Recon. at 15, citing *Hornby*, 87 USPQ2d at 1416.  Petitioner's criticism is unwarranted.  As noted above, the Decision cites numerous news articles relating to Petitioner from a wide range of time periods.  *Hornby* addressed whether evidence of fame or reputation that post-

Cancellation No. 92047809

dated the relevant date of registration should be excluded. As in *Hornby*, the Board in the present case did not exclude from evidence any of the news items submitted by Petitioner: indeed, the Board overruled Registrant's objections to the first and second testimonial depositions of Rosemarie Szostak, which contained many such press notices. Decision at 6-7.

After due consideration of all issues raised in Petitioner's request for reconsideration and in his reply brief, including those not specifically addressed herein, Petitioner's request for reconsideration is denied and the Board adheres to its decision of April 22, 2013 dismissing the petition for cancellation.

Form PTO 55 (12-80)

# U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

October 18, 2013

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the content entries in the file of the trademark cancellation and the involved registrations identified below. The list was taken from the TTABvue and TSDR electronic databases of this Office and comprises the record before the United States Patent and Trademark Office.

**Terry v. Newman**

**Cancellation No. 92047809**

**Registration No. 3,179,591**
**Mark: OPERATION RESCUE**



By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Certifying Officer*

## PROSECUTION HISTORY – CANCELLATION NO. 92047809
### (Registration No. 3,179,591)

| DATE | DESCRIPTION |
|------|-------------|
| 05/16/2005 | APPLICATION,  DRAWING, AND SPECIMEN |
| 12/13/2005 | XSEARCH SEARCH SUMMARY |
| 12/13/2005 | NON-FINAL OFFICE ACTION |
| 06/08/2006 | REVOCATION OF ATTORNEY AND APPOINTMENT OF ATTORNEY |
| 06/08/2006 | SPECIMEN |
| 06/08/2006 | RESPONSE TO OFFICE ACTION |
| 07/12/2006 | TRADEMARK SNAP SHOT PUBLICATION STYLESHEET |
| 08/30/2006 | NOTICE OF PUBLICATION |
| 12/05/2006 | REGISTRATION CERTIFICATE |
| 07/10/2007 | PETITION TO CANCEL |
| 07/16/2007 | ORDER:  PROCEEDINGS INSTITUTED |
| 08/26/2007 | DEFENDANT'S CHANGE OF CORRESPONDENCE ADDRESS |
| 08/26/2007 | DEFENDANT'S MOTION TO DISMISS - RULE 12(B) |
| 08/26/2007 | DEFENDANT'S CHANGE OF CORRESPONDENCE ADDRESS |
| 09/19/2007 | PLAINTIFF'S RESPONSE TO DEFENDANT'S TO MOTION TO DISMISS |
| 10/26/2007 | ANSWER |
| 11/27/2007 | ORDER:  AMENDED PETITION TO CANCEL ACCEPTED; MOTION TO DISMISS MOOT |
| 12/13/2007 | PLAINTIFF'S AMENDED PETITION TO CANCEL |
| 12/14/2007 | DEFENDANT'S MOTION FOR EXTENSION OF TIME WITH CONSENT |
| 12/14/2007 | ORDER:  EXTENSION OF TIME GRANTED |
| 12/22/2007 | DEFENDANT'S RESPONSE TO MOTION TO AMEND PETITION TO CANCEL |
| 01/04/2008 | PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S AMENDED PETITION TO CANCEL |
| 01/05/2008 | PLAINTIFF'S MOTION TO WITHDRAW AS ATTORNEY |
| 02/01/2008 | ORDER: PROCEEDINGS SUSPENDED |
| 02/29/2008 | PLAINTIFF'S MOTION FOR AN EXTENSION OF TIME |
| 03/04/2008 | ORDER:  EXTENSION OF TIME TO OBTAIN NEW COUNSEL GRANTED; RESPONSE DUE 30 DAYS |
| 03/04/2008 | PLAINTIFF'S MOTION FOR AN EXTENSION OF TIME |
| 04/04/2008 | PLAINTIFF'S APPEARANCE OF COUNSEL |
| 04/04/2008 | PLAINTIFF'S CHANGE OF CORRESPONDENCE ADDRESS |
| 04/10/2008 | ORDER:  EXTENSION OF TIME GRANTED |

1

| DATE | DESCRIPTION |
|------|-------------|
| 05/27/2008 | PLAINTIFF'S MOTION TO AMEND PLEADING |
| 06/16/2008 | DEFENDANT'S RESPONSE TO MOTION TO AMEND |
| 06/18/2008 | ORDER: PROCEEDINGS SUSPENDED PENDING OUTCOME OF MOTION |
| 06/23/2008 | PLAINTIFF'S REPLY TO MOTION TO AMEND PLEADING |
| 11/14/2008 | ORDER: MOTION TO AMEND GRANTED; MOTION FOR PROTECTIVE ORDER IS GRANTED IN PART; TRIAL DATES RESET |
| 12/14/2008 | ANSWER |
| 03/13/2009 | DEFENDANT'S MOTION FOR EXTENSION OF TIME WITH CONSENT |
| 03/13/2009 | ORDER: EXTENSION OF TIME GRANTED |
| 05/15/2009 | DEFENDANT'S MOTION FOR EXTENSION OF TIME WITH CONSENT |
| 05/16/2009 | ORDER: EXTENSION OF TIME GRANTED |
| 08/14/2009 | DEFENDANT'S MOTION TO COMPEL DISCOVERY |
| 08/20/2009 | ORDER: PROCEEDINGS SUSPENDED PENDING DISPOSITION OF MOTION |
| 09/03/2009 | PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL |
| 10/30/2009 | ORDER: MOTION TO COMPEL GRANTED IN PART; PROCEEDINGS RESUMED |
| 12/04/2009 | PLAINTIFF'S MOTION FOR EXTENSION OF TIME WITH CONSENT |
| 12/04/2009 | ORDER: EXTENSION OF TIME GRANTED |
| 02/18/2010 | PLAINTIFF'S MOTION FOR EXTENSION OF TIME WITH CONSENT |
| 02/22/2010 | ORDER: EXTENSION OF TIME GRANTED |
| 02/22/2010 | ORDER: EXTENSION OF TIME GRANTED |
| 03/23/2010 | PLAINTIFF'S MOTION FOR AN EXTENSION OF TIME |
| 04/16/2010 | DEFENDANT'S OPPOSITION TO MOTION TO EXTEND TIME |
| 04/22/2010 | PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO EXTEND |
| 06/25/2010 | ORDER: MOTION TO EXTEND GRANTED; TRIAL DATES RESET |
| 08/24/2010 | PLAINTIFF'S MOTION FOR EXTENSION OF TIME WITH CONSENT |
| 09/16/2010 | ORDER: EXTENSION OF TIME GRANTED |
| 09/27/2010 | PLAINTIFF'S MOTION TO TAKE TRIAL TESTIMONY OUT OF TIME |
| 09/30/2010 | PLAINTIFF'S NOTICE OF RELIANCE |
| 09/30/2010 | PLAINTIFF'S NOTICE OF RELIANCE |
| 10/04/2010 | PLAINTIFF'S WITHDRAWAL OF MOTION TO TAKE TRIAL TESTIMONY OUT OF TIME |
| 10/15/2010 | DEFENDANT'S MOTION TO STRIKE TESTIMONIAL DEPOSITIONS OF P. BENHAM, J. COSTELLO, M. HIRSH, M. A. STEINER, R. SZOSTAK AND R. THOMAS |

| DATE | DESCRIPTION |
|------|-------------|
| 10/28/2010 | PLAINTIFF'S OPPOSITION TO MOTION TO STRIKE TESTIMONIAL DEPOSITION OF R. TERRY |
| 10/28/2010 | PLAINTIFF'S OPPOSITION TO MOTION TO STRIKE TESTIMONIAL DEPOSITION OF P. BENHAM, J. COSTELLO, M. HIRSH, M. A. STEINER, R. SZOSTAK AND R. THOMAS |
| 10/28/2010 | TESTIMONY FOR PLAINTIFF OF P. BENHAM, M. A. STEINER, AND R. TERRY (PART 1) |
| 10/28/2010 | TESTIMONY FOR PLAINTIFF OF R. TERRY (PART 2) |
| 10/28/2010 | TESTIMONY FOR PLAINTIFF OF R. TERRY (PART 3), M. HIRSH, R. L. THOMAS, AND R. SZOSTAK (PART 1) |
| 10/29/2010 | TESTIMONY FOR PLAINTIFF AND R. SZOSTAK (PART 2) AND J. COSTELLO |
| 11/02/2010 | PLAINTIFF'S SUPPLEMENTAL SUBMISSION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STRIKE |
| 11/03/2010 | ORDER:  MOTION TO EXTEND GRANTED; TRIAL DATES RESET |
| 11/03/2010 | STIPULATION TO TAKE TESTIMONY OUT OF TURN |
| 11/10/2010 | PLAINTIFF'S SUPPLEMENTAL SUBMISSION OF ERRATA SHEET FOR TESTIMONIAL DEPOSITION FOR R. TERRY |
| 12/02/2010 | ORDER:  MOTION TO STRIKE P. BENHAM, J. COSTELLO, M. HIRSH, M. A. STEINER, R. SZOSTAK AND R. THOMAS IS  DENIED; MOTION TO STRIKE AS TO R. TERRY IS DEFERRED; TRIAL DATES REMAIN AS SET |
| 02/04/2011 | DEFENDANT'S NOTICE OF RELIANCE (PART 2) |
| 02/07/2011 | DEFENDANT'S NOTICE OF RELIANCE (PART 1) |
| 03/14/2011 | PLAINTIFF'S MOTION FOR EXTENSION OF TIME WITH CONSENT |
| 03/20/2011 | ORDER:  EXTENSION OF TIME GRANTED |
| 04/18/2011 | TESTIMONY FOR PLAINTIFF OF B. MOORE |
| 04/18/2011 | PLAINTIFF'S NOTICE OF RELIANCE |
| 04/19/2011 | TESTIMONY FOR PLAINTIFF OF R. SZOSTAK |
| 04/25/2011 | TESTIMONY FOR DEFENDANT OF J. WHITE AND P. FAUSTIN |
| 04/25/2011 | TESTIMONY FOR DEFENDANT OF T. BREJCHA |
| 05/04/2011 | TESTIMONY FOR PLAINTIFF OF R. TERRY |
| 06/17/2011 | BRIEF ON MERITS FOR PLAINTIFF |
| 07/18/2011 | BRIEF ON MERITS FOR DEFENDANT |
| 08/02/2011 | PLAINTIFF'S REBUTTAL BRIEF |
| 08/03/2011 | PLAINTIFF'S REQUEST FOR ORAL HEARING |
| 08/15/2011 | BOARD'S ORDER REGARDING ORAL HEARING |
| 12/05/2012 | SPECIMEN |

| DATE | DESCRIPTION |
|---|---|
| 12/05/2012 | POST REGISTRATION – SECTION 8 DECLARATION OF USE |
| 12/05/2012 | CHANGE OF ADDRESS |
| 12/26/2012 | NOTICE OF ACCEPTANCE OF SECTION 8 |
| 01/29/2013 | ORAL HEARING SCHEDULED |
| 02/12/2013 | ORAL HEARING APPEARANCE RECORD |
| 04/22/2013 | BOARD'S DECISION: DISMISSED WITH PREJUDICE |
| 05/22/2013 | PLAINTIFF'S REQUEST FOR RECONSIDERATION OF FINAL BOARD DECISION |
| 06/11/2013 | DEFENDANT'S RESPONSE TO MOTION FOR RECONSIDERATION |
| 06/28/2013 | PLAINTIFF'S REPLY BRIEF OR REBUTTAL BRIEF ON COUNTERCLAIM: TM RULE 2.128 |
| 06/28/2013 | PLAINTIFF'S REQUEST FOR ORAL HEARING |
| 07/10/2013 | ORDER: PLAINTIFF'S REQUEST FOR RECONSIDERATION DENIED |
| 09/09/2013 | APPEAL TO CAFC (ESTTA COPY) |
| 09/12/2013 | APPEAL TO CAFC (PAPER COPY) |